It is my view that legislation of the type under consideration here (which is essentially price fixing of the worst character, i.e. the fixing of a minimum price floor as distinguished from a maximum price ceiling without a yardstick for the establishment of such minimum price or any provision for public notice or hearing) may be valid but it is so only when emergencies which threaten the general welfare require its enactment. Such condition should be real and not fanciful. Resort to the drastic expedient of invoking the police power of a sovereign state by the passage of legislation of this character should not be permitted in the absence of concrete evidence of public necessity.
Some of the situations which the writer can now envisage which may give rise to valid legislation of this class are the exigencies of war or threats of economic chaos. In the former of these suggested fundamental bases, the problem presented by such emergencies would appear to be one which should evoke Federal action rather than legislation by any or all of the several states. This is true, broadly speaking, in the latter of these indicated premises. However, recognition must be given to the fact that a major industry which affects the general welfare, located in only one state, could be on the verge of economic calamity and if such be determined to be the fact that state might then find justification for remedial legislation.
It is true that courts of last resort in several states and the Supreme Court of the United States have upheld acts similar to this so-called Fair Trade Act. The fact that those laws were either enacted at a time when we were experiencing a depression national in its scope or were challenged when such was our economic status, is worthy of serious consideration in connection with the present litigation.
If not actually essential, by far the better procedure and that fraught with less danger of non-essential invasion of constitutional rights of the consumer and the retail merchant would be the finding as a predicate for such legislation that extremities requiring it exist as a matter of fact. If well founded, this would assure validity at the time of its enactment, but would not necessarily guarantee its permanency as valid legislation. The basis for such law actually should be present not only at the time of its passage but the law should exist only so long as the situation which gave rise to it continues. The duration of its existence should be from one legislative session to the next, at which time the law could be reenacted if the necessity for it should still subsist. Without appropriate predicate, legislation of this kind is unconstitutional from its inception and absent a limitation on its life span it might become so by virtue of changed or improved conditions.
The validity of such legislation can be founded only upon, what was termed in the ancient days of the Roman Empire, the summum bonum — the greatest good for the greatest number — and what we now call general welfare. It is solely upon such premise that a legislative enactment, which is flagrantly violative of the established law of contracts, which destroys initiative on the part of the retail merchant and affects adversely the economic life of the common man and which portrays monopolistic, if indeed they are not communistic, tendencies, can be sustained. Under normal conditions such legislation is not consonant with our philosophy and fundamental principles of government as I understand that philosophy and those principles. It is not truly a "Fair" Trade Act so far as its effect upon the consuming public is concerned, but actually it is "unfair" and unconstitutional.
It is the failure to first investigate and make a determination of public necessity which causes such legislation to be fraught with shocking possibilities. An act of this type must be subjected to close scrutiny with respect to its constitutionality. Its genesis must find justification in, and its *Page 387 
life depend upon, public necessity. By this I mean that the subject of the act and the purposes to be accomplished by it should bear, in a vital and practical sense, a reasonable relationship to the public health, safety, morals or similar element which is fundamentally and essentially a component part of the general welfare. Otherwise, a law of this nature not only offends certain constitutional provisions but it is also inimicable to some of our elementary democratic principles. It stifles individual initiative and allows no premium upon the personal ingenuity and efforts of the successful merchant — as distinguished from the lethargy of the mediocre — and sometimes, as here, it violates the basic law of contracts.
The very technical and finespun theory of vertical contracts as differentiated from those which are horizontal does not appeal to, satisfy nor indeed protect the average citizen. He does not appreciate nor understand why the interest of the consuming public, which group is comprised of a vast majority of our people, should be subservient to the property right of the individual owner of a trade-name, mark or brand. It appears to the writer that his reasoning is sound. Admitting the existence of such property right the welfare of the "greatest number" should take precedence over that of a favored few if a choice must be made which will invade or infringe the constitutional guaranties of either group. The average citizen of whom I speak, the common man, if you please, believes in free enterprise, that "competition is the life of trade", and that the principles of supply and demand and of building a "better mousetrap" have contributed in no small measure to making this Nation great.
If we are to have a "controlled economy" there may be a place for laws of the type here under consideration. But as I understand a "controlled economy" it should not exist absent emergencies which require it in the interest of the general welfare. In any event, a law which provides for the fixing of minimum prices should contain a yardstick as a guide for the establishment of such ground level prices.
The power to determine those prices should not be left to the unleashed discretion of the trade-name owner but should be confined within impregnable specified boundaries. A definite measuring stick should be set forth in the body of the act. This statute contains no such rule. No checkrein is included therein. The unrestrained whim or fancy of the trademark owner is the only criterion. There is no provision for the public to be heard or the public interests to be considered much less protected.
The law is not aimed directly at the "loss leader" problem. It goes far beyond such point. As I comprehend the expression "loss leader" it means that a retail merchant may advertise a well known trade-marked article for sale at less than cost to entice patrons to his establishment, who, while there, might purchase other merchandise upon which the retailer makes a profit and thereby more than overcomes his loss. If this or any such law should, by its express terms, only prohibit the "loss leader" practice it might be less offensive. We are not now confronted by such an act.
According to one of the parables contained in Holy Writ, a vineyard owner hired some laborers early in the morning at a penny a day. Others were employed, and came to work, later. At the end of the day the employer paid all of them the same wage. He was severely criticized. The answer which he gave was: "Is it not lawful for me to do what I will with mine own? Is thine eye evil because I am good?" Matthew 20:15. This philosophy is currently as fundamentally sound as it was in Biblical days. But it is suggested a trade-marked article does not actually or in every sense belong to the retailer who purchases it for resale because the trademark owner has a property right in the trade-mark and the good will, which may attach thereto, is his.
Let it be granted, as it should and must be, that our Constitutions do expressly provide protection to the property rights of every individual, just how far does such protection as intended by the Constitution of Florida extend? Is the theoretical protection provided by this act *Page 388 
really contemplated by our constitutional guaranties? What is, or should be construed to be, the scope of the protection which is provided by our constitution to the property rights of the individual? Is such protection a shield or is it a sword which can be used to pierce and draw the life blood from the constitutional rights of others who constitute by far the greater number of our citizens? It is my opinion that it should become a sword only in the event it is essential to the survival of the economic life of this body of free people. Laws of this character should not be passed under the pretense of protection to the property rights of the individual trade-name owner or in the alleged interest of the general welfare unless such protection is necessary or the general welfare really requires their enactment.
The owner of a trade-name, mark or brand does not need such protection — particularly when it transgresses the rights of others — because he has it within his power to protect himself. He need not furnish his product to the retailer who refuses to agree to his minimum resale price.
But it is said an agreement between the trade-name owner and the individual retailer is both impractical and unlawful. Impracticability is no excuse, much less reason, for a law of the type now before us. Some method of distribution which would make such an agreement practical of accomplishment should be devised instead of creating an iniquitous law that violates the constitutional rights of other citizens. If the suggestion that agreements between retailers and trade-name owners are unlawful be well founded, a law directed solely to the correction of this situation, as in the case of the "loss leader" problem, should provide the panacea.
Why should the trade-name owner have protection, which he does not need, at the expense of the consumer? The statement was once made and it is profound that "When reason and the law part there is no law". When I contemplate the means employed by many selfish interests to bring about the ends which they desire my mind reverts to Cicero's outburst in one of his orations against Catiline when he said: "To what length wilt thou abuse my patience; to what extent wilt thy unbridled audacity affront itself?"
Such legislation is constitutional and can be constitutional only in extreme situations wherein our economic structure is seriously endangered. In some periods through which this Nation has passed no one should have questioned the propriety of such drastic measures for blood transfusions probably were essential to the preservation of a healthy body politic. It is another thing, however, to foist such legislation upon the general public in normal times under the guise of ultimate protection and benefit to the public when exigencies which might demand it are nonexistent.
It is my conclusion that the enactment of this law, which contains a provision for the fixing of minimum resale prices and provides that parties not parties to a contract must nevertheless be bound by such contract, was an unwarranted, unreasonable and arbitrary exercise of legislative power and should be declared invalid.
ADAMS, C.J., and TERRELL, SEBRING, and BARNS, JJ., concur.